UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JOAO TOVAR,

                        Plaintiff,

        -v-

ROBERT INDIANA,

                       Defendant.
------------------------------------------------------------- X

12 Civ. 6104 (KBF)

MEMORANDUM
DECISION & ORDER

KATHERINE B. FORREST, District Judge:

    In 2007, a great artist permitted a lesser artist to make art based on the great artist's most well-known work. In 2008, the lesser artist made several pieces of poor art that was not covered by the license granted, and sold it to a dealer, who then resold it for a substantial profit. In 2009, the great artist got wind of the lesser artist's creation of the poor art and made public that he never licensed the poor art's creation and had nothing whatsoever to do with it. Accordingly the poor art, including any pieces still held by the dealer, plummeted in value. Now the dealer has sued the great artist. But the great artist had no connections with the dealer, contractual or otherwise. Nor did the great artist ever lie to the dealer about anything, or indeed make any lie that affected the dealer in any way. For those reasons, more fully explained below, the Court here grants the great artist's motion to dismiss, now before the court, in its entirety.

BACKGROUND

Defendant Robert Indiana created the iconic "LOVE" sculpture, which has the "O" positioned at an angle. (See Compl. ¶ 5.) On August 2, 2007, Indiana and one John Gilbert entered into an agreement (the "License Agreement") pursuant to which Indiana as the "Artist" and "Licensor" would create--and Gilbert as the "Licensee" would produce and sell--objects with Hindi script designs of the Hindi word for "love," spelled phonetically in Latin letters from the English alphabet: "prem" (the "Indian Prem" or "Prem Love"). (See generally Compl. Ex. 1.) The License Agreement stated that its purpose was "to create an arrangement between the Artist and the Licensee for the creation/production of the Artist's work Prem Love depicted in the attached photos and their derivative works." (Id. at 1.) The agreement provided for two $50,000 payments from Gilbert to Indiana, plus a ten percent royalty of all sales by Gilbert. (Id. at 1-2.) It also required Indiana to indemnify Gilbert for "any third party intellectual property claims." (Id. at 2.) It finally contained a merger clause which stated, in pertinent part: "The Agreement contains the entire understanding between the parties." (Id.)

The instant dispute relates, in part, to whether the License Agreement also encompassed another design: a design with block capital letters that used the Latin letters "P," "R," "E," and "M" (the "English Prem"). Importantly however, the photographs attached to the License Agreement showed three different designs of only Indian Prem--none of the attachments used the Latin letters "P," "R," "E," or "M." See Gilbert v. Indiana, 09 Civ. 6352, 2012 WL 688811, at *1 (S.D.N.Y. Mar. 2,

2

2012) (hereinafter "Indiana I").[1] The only similarity between Indian Prem and English Prem is not in design, but rather solely in the use of the word "Prem" (albeit in different languages and script).

Plaintiff Joao Tovar alleges that he purchased ten English Prem sculptures from Gilbert beginning in May 2008. (Compl. ¶¶ 7-8; see also Indiana I, 2012 WL 688811 at *3.) He alleges that the sculptures purchased had a market value of $1.5 million, that he purchased them for $481,625, and that he resold "[m]any" of them to third parties for around $710,000. (Compl. ¶¶ 7, 46, 47.) He further alleges that "[m]any" of those sculptures were resold by those third parties for around $1.12 million, and that others were "slated for sale in Milan, Italy, and Dubai" by Sotheby's and Christie's auction houses. (Id. ¶¶ 24, 48.)

---

[1] The copy of the License Agreement, signed in 2007, and attached to the Complaint in this action includes a design of English Prem. (See Compl. Ex. 1 at 4.) However, in related litigation before this Court between Gilbert and Indiana--the parties who in fact executed the License Agreement, and designed, created, and produced both Indian Prem and English Prem--the following facts were undisputed: (1) the License Agreement included only designs of Indian Prem, and not of English Prem; (2) Indiana knew nothing of English Prem in 2007; and (3) English Prem was first made known to Indiana only in early 2008. Indiana I, 2012 WL 688811 at *1-2. Although this is a motion to dismiss, the Court may properly consider these facts. See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 471 and n.2 (1st Cir. 2012) (permitting consideration of judicial opinions, other official or public documents, documents central to the parties' claims, documents upon which the complaint relies, and documents the authenticity of which is not in dispute).

Based on this timeline and these facts, it is impossible that the English Prem was attached to the License Agreement in 2007, when Gilbert had not shown it to Indiana until 2008. Although Tovar's potentially accidental attachment of an incorrect version of the License Agreement to his complaint was pointed out to Tovar by defense counsel, Tovar has chosen not to directly address the issue in three separate briefs filed on this motion. (See generally docket nos. 10, 16, and 32.) Instead, in the supplemental brief Tovar filed before this Court, Tovar simply acknowledged that "Indiana first saw sketches of English Perm pursuant to a January 21, 2008 letter." (See Pl.'s Supplemental Mem. of Law in Opp'n to Def. Robert Indiana's Mot. to Dismiss ("Pl.'s Supp. Opp'n"), docket no. 32, at 3.) Thus, Tovar has essentially conceded this point despite the inaccurate version of the License Agreement attached to his complaint.

3

Tovar does not allege that Indiana created or designed English Prem. Instead, Tovar alleges that "Indiana approved the creation and production of" English Prem. (Id. ¶ 11.)

Tovar also alleges that Indiana "executed a certificate of authenticity for the sculptures." (Id. ¶ 12.) This alleged certificate of authenticity (the "COA") is attached to the complaint. It states: "As editor and publisher of the Robert Indiana Perm-Love project . . . I hereby certify the authenticity of this Robert Indiana sculpture . . . [and] have zealously reflected his artistic intention in every work that I published." (Compl. Ex. 2.) The COA ends: "JOHN GILBERT Prem Love Art Publishing Ltd. Mysore India May 2008," and is signed by Gilbert. (Id.) On the side of the COA, in handwriting, are the words "For Tovar," with Indiana's signature. (Id.)

The story does not, however, end with Tovar's resale of "many" of the English Prem sculptures for a profit of approximately $230,000. On June 3, 2009, Indiana wrote a letter to one Simon Salama-Caro stating that English Prem "is . . . not my work." (Compl. ¶ 15 and Ex. 4 at 1.) Tovar alleges that this act rendered the English Prem sculptures he purchased "worth little more than the materials from which they were made." (Compl. ¶ 16.)

In this suit against Indiana, Tovar asserts six causes of action: (1) breach of the License Agreement; (2) product disparagement; (3) violation of New York Art and Cultural Affairs Law ("NYACAL") section 13.01.3(a); (4) breach of the COA; (5) unjust enrichment; and (6) misrepresentation. (Id. ¶¶ 27-78.)

Tovar, moreover, is not the only person to have sued Indiana in this story. In 2009, Gilbert sued Indiana alleging similar facts and asserting various claims, each one of which was premised on Indiana, as the creator of English Prem, being contractually bound to Gilbert. See Indiana I, 2012 WL 688811, at *1-3. This Court granted Indiana's motion for summary judgment on March 2, 2012, ruling, in sum, that English Prem was not covered by the License Agreement, that English Prem was not a "derivative work" of Indian Prem (which was covered by that agreement), and that Indiana and Gilbert did not modify or amend the License Agreement to cover English Prem either (a) by Indiana's statement "this is an Indiana" upon seeing two designs of English Prem in 2008, or (b) by Indiana placing his signature on the COA. See id. at *4-6.

## DISCUSSION

### Choice of Law

This action, originally brought in Maine State Superior Court (Knox County) was removed by Indiana to the District of Maine, and then transferred to this Court pursuant to 28 U.S.C. § 1404(a).[2] (See docket no. 20 at 2-4.) "[W]hen a case is transferred for convenience under 28 U.S.C. §1404(a), the law of the transferor state is to be applied so long as the transferor state could properly have exercised

---

[2] 28 U.S.C. § 1404(a) provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

5

jurisdiction." Gerena v. Korb, 617 F.3d 197, 205 (2d Cir. 2010). Accordingly, this Court will apply Maine law to the issues on this motion.[3]

## Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain enough factual material 'to raise a right to relief above the speculative level.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2012) (quoting Bell Alt. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 49 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 570); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

---

[3] Although the License Agreement contained a choice of forum clause pointing to New York State courts, it in fact contained no choice of law clause. (See Compl. Ex. 1 at 2.) Indeed, even if the License Agreement had contained a choice of law clause mandating New York law, that clause would have governed disputes concerning the language of the contract--it would not govern the legal theories Tovar sues under in this case.

6

**Damages**

As a threshold matter, Tovar has not adequately pleaded damages. This alone disposes of his claims. Damages are an essential element of breach of contract, product disparagement, and misrepresentation. See Wetmore v. MacDonald, Page, Schatz, Fletcher & Co., LLC, 476 F.3 1, 3 (1st Cir. 2007) (breach of contract elements include damages) (quoting Me. Energy Recovery Co. v. United Steel Structures, Inc., 724 A.2d 1248, 1250 (Me. 1999))[4]; Found. for Blood Research v. St. Paul Marine & Fire Ins. Co., 730 A.2d 175, 179 (Me. 1999) (disparagement); Allolding v. Portland Housing Auth., CV-02-675, 2003 WL 23109962, at *3 (Me. Super. Ct. Nov. 18, 2003) (misrepresentation).

Tovar alleges that he purchased ten English Prem sculptures from Gilbert for $481,625, and resold "many" of them for $710,000. (Compl. ¶¶ 7-8, 46-47.) He therefore ended up up $228,375 combined as a middleman in transactions in English Prem, and his tort claims for disparagement and misrepresentation fail immediately.[5] Moreover, any contract expectation damages Tovar might have

---

[4] There appears to be some confusion in Maine law whether a party must allege actual damages, or simply "nominal" damages to sustain a breach of contract claim. Compare In re Hannaford Bros. Co. Customer Data Security Breach Litig., 4 A.3d 492, 495 (Me. 2010) ("actual injury or damage is an element of . . . breach of contract claims") with Mozingo v. Stanley Med. Research Inst., CV-05-186, 2006 WL 759739, at *1 (Me. Super. Ct. Jan. 28, 2006) ("Although breach of contract damages are generally based on the injured party's interest in having the benefit of its bargain, nominal damages are also available in breach of contract action [sic]").

[5] Tovar requests $1 million in punitive damages on his disparagement claim. (Compl. ¶ 53.) "Under Maine law, punitive damages may be imposed if a tortfeasor acts deliberately with 'express' or 'actual' malice, or so outrageously that malice can be implied." Shannon v. Sasseville, 684 F. Supp. 2d 169, 173 (D. Me. 2010). Indiana sold no sculpture to Tovar. There is no allegation he was aware of Tovar's intent to resell the English Prems for value. Indeed, the only allegation connecting Tovar and Indiana at all is that Indiana endorsed Gilbert's COA. This is entirely insufficient to adequately allege any malicious plan on Indiana's part concerning Tovar's purchase and resale of English Prem. Moreover, it was Indiana, and possibly Tovar, who were taken advantage of by Gilbert. It was

7

based on his resale of any unsold English Prems--damages he does not claim in the complaint--would require Tovar's perpetration of the very fraud he complains of. It rings of hypocrisy to claim victimhood due to both a fraud being perpetrated upon you and your inability to perpetrate that fraud yourself.

Each of Tovar's claims fails, however, for additional reasons as well.

**Third Party Beneficiary of the License Agreement**

Tovar's first count is for breach of the License Agreement. Tovar of course did not sign and was not party to the License Agreement. He argues, however, that he was an intended third party beneficiary of that contract, and therefore entitled to sue under it. (Pl.'s Supp. Opp'n at 6-9.)

In Maine, a party is an intended third party beneficiary of a contract between other parties--and can therefore sue to enforce performance of that contract--if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties [to the contract] and either (a) the performance of the promise will satisfy an obligation to the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Davis v. R C & Sons Paving, Inc., 26 A.3d 787, 790 (Me. 2011) (quoting Restatement (Second) of Contracts § 302); DiMillo v. Travelers Prop. Cas. Co. of Am., 789 F. Supp. 2d 194, 207 (D. Me. 2011).

As an initial matter, there is nothing whatsoever in Tovar's complaint indicating that Gilbert--the promisee--intended to give Tovar--the beneficiary--the

---

Gilbert who acted outrageously by selling sculptures Indiana never agreed to put his name on, and then suing Indiana in an attempt to force Indiana to do so.

benefit of the performance promised to Gilbert (the right to produce Indian Prem). Therefore, even assuming <u>arguendo</u> that Tovar's right to sue on Indiana's obligations would "effectuate the intention" of Indiana and Gilbert, Tovar's claim still fails. See <u>Davis</u>, 26 A.3d at 790. Tovar's quite general argument in opposition is that he <u>must</u> be an intended third party beneficiary because if not for him, or any downstream purchaser, neither Gilbert nor Indiana could make any money from their arrangement. Thus, argues Tovar, Gilbert and Indiana both must have intended that third parties <u>benefit</u> from the License Agreement by obtaining fine art because without third parties buying the art in question, Gilbert and Indiana would get no cash. (See Pl.'s Supp. Opp'n at 8; <u>see also</u> Compl. ¶¶ 32-33.)

As a textual matter, this argument is fine so far as it goes. But in reality, it makes little sense, and indeed is not the law. First, it reverses the doctrine of third party beneficiary. The third party beneficiary does not, by its existence or participation, create the benefit realized by the contracting parties--instead the third party beneficiary is the one actually benefitted from the contracting parties' contract. Second, a distribution or licensing agreement between any manufacturer and any distributor or retailer always contemplates downstream purchasers. The logical consequence of Tovar's argument would be that every consumer of any product for which different companies serve as manufacturer and retailer could sue the manufacturer and/or retailer for breach of any of the agreements existing between those entities. This result is absurd.[6]

---

[6] Tovar cites no caselaw from any jurisdiction for this proposition, and the Court has found none. However, similar situations from other jurisdictions interpreting the Restatement (Second) of

Nor is there any language in the contract illustrating an intention of either party to grant rights in any other party, further refuting Tovar's claim to intended third party beneficiary status. See DiMillo, 789 F. Supp. 2d at 207-08; Devine v. Roche Biomed. Labs., 659 A.2d 868, 870 (Me. 1995); see also Klamath Water Users, 204 F.3d at 1211 (interpreting Restatement (Second) of Contracts § 302). Tovar argues that the License Agreement's indemnification term requiring Indiana to indemnify Gilbert for intellectual property claims from third parties indicates Indiana and Gilbert's intent to allow third parties to enforce the contract. (Pl.'s Supp. Opp'n at 8; see also Compl. ¶ 34.) Again, this confuses the doctrine. The indemnification term represents a promise from Indiana to Gilbert that third parties do not have rights or benefits under the License Agreement--it is not any kind of promise granting rights to third parties.

---

Contracts or in which third party beneficiary status requires some manifestation of intent from the contracting parties demonstrate the obvious fallacy of the position. See, e.g., Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1212 (9th Cir. 1999) (although contract between government and damn builder benefitted surrounding irrigators, "to allow [the irrigators] intended third party beneficiary status would open the door to all users receiving a benefit from the Project achieving similar status, a result not intended by the Contract"); Syngenta Seeds, Inc. v. Bunge N. Am., Inc., 820 F. Supp. 2d 953, 966, 983-84 (N.D. Iowa 2011) (seed manufacturer who sold seed to farmers who stored plants grown from that seed at grain warehouse not intended third party beneficiary of contract between grain warehouse and government permitting grain warehouse to operate); Marvel Enters., Inc. v. World Wrestling Fed'n Entm't, Inc., 610 S.E.2d 583, 591 (Ga. Ct. App. 2005) (clothing manufacturer not intended third party beneficiary of contract between performers/licensors and performance company/licensee, although neither performance company nor performers could benefit from contract without purchasing clothes from manufacturer); Tyler v. PepsiCo, Inc., 400 S.E.2d 673, 677 (Ga. Ct. App. 1990) (consumers not third party beneficiaries of agreements between soft drink licensor and soft drink bottler).

Accordingly, Tovar's claim as a third party beneficiary of that agreement fails as a matter of law. See DiMillo 278 F. Supp. 2d at 211-12.[7]

**Product Disparagement**

The elements of "product disparagement" under Maine law are "publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages." Blood Research, 730 A.2d at 179 n.1.[8] Tovar alleges that Indiana's "renunciation" of the authenticity of the English Prem sculptures destroyed their value. (See Compl. ¶¶ 49-51.) But nowhere does the complaint allege that the renunciation was false. Indeed, Tovar's entire case is dependent on the renunciation--i.e., the statement that English Prem was not an Indiana sculpture--being true. Having failed to allege falsity, Tovar's claim for product disparagement cannot stand.

**Breach of New York Arts and Cultural Affairs Law § 13.01.3(a)**

As an initial matter, it is unclear under what authority Tovar asserts his claim for breach of New York statutory law concerning artists and certificates of authenticity. Because this case was brought in Maine and transferred to this Court under 28 U.S.C. § 1404(a), the law of Maine governs this case. Moreover, nothing in

---

[7] The result would be the same under New York law, which also requires inter alia that the contracting parties, or the contract itself, manifest an intent to allow third parties to enforce the contract. See Thompson v. Bosswick, 855 F. Supp. 2d 67, 84 (S.D.N.Y. 2012) (elements include (1) existence of a valid and binding contract between other parties; (2) that the contract was specifically intended for claimant's benefit; and (3) the benefit is immediate, not incidental, indicating that the parties intended to compensate the claimant if the benefit were lost).

[8] In New York, "Product Disparagement" similarly requires a statement tending to "negatively reflect upon the condition, value, or quality of a product," falsity, publication, malice, and special damages. Thome v. Alexander & Louisa Calder Found., 890 N.Y.S.2d 16, 28 (1st Dep't 2009).

11

the COA--which was executed in Maine,[9] see Indiana I, 2012 WL 688811, at *3-- points towards New York law being applicable to it. Finally, the COA is not part of the License Agreement. Thus, even if the Court were applying New York law to interpret the terms of the License Agreement, Maine law would still apply to the COA.

Putting that aside, however, Tovar still fails to state a claim for breach of NYACAL section 13.01.3(a). That section states, in pertinent part, that "[l]anguage used in a certificate of authenticity . . . stating that . . . work is by a named author . . . means unequivocally, that the work is by such named author." NYACAL § 13.01.3(a). However, section 13.01.3(a) itself does not create the cause of action a litigant sues under. That is created in section 13.01.1 which states: "Whenever an art merchant[10] . . . furnishes to a buyer . . . who is not an art merchant a certificate of authenticity[11] . . . it (a) [s]hall be presumed to be part of the basis of the bargain; and (b) [s]hall create an express warranty for the material facts stated." NYACAL § 13.01.1.

Tovar fails to allege a violation by Indiana of section 13.01.3(a) for several reasons. First, section 13.01, read as a whole, applies only to sales by art merchants to non-art merchants.[12] See NYACAL § 13.01.1. Tovar purchased ten

---

[9] Or perhaps even in Mysore, India (see Compl. Ex. 2)--but in any event, not in New York.

[10] "Art merchant" is defined as one "in the business of dealing" in fine art, or who "holds himself out as having knowledge or skill peculiar" to art. NYACAL § 11.01.2. "Artist" is separately defined as the "creator of a work of fine art." NYACAL § 11.01.1.

[11] "Certificate of authenticity" is defined as "a written statement by an art merchant . . . attesting to the authorship of a work of fine art." NYACAL § 11.01.6.

[12] Tovar argues that section 13.01.3 is a stand-alone subsection, for which section 13.01.1's requirement of a sale from an art merchant to a non-art merchant does not apply. (See Pl.'s

12

English Prem sculptures, resold "many" of them at a substantial profit including to major auction houses such as Sotheby's and Christie's. By his own allegations, Tovar is clearly in the business of dealing in art, the primary definition of an "art merchant" for purposes of NYACAL. See NYACAL § 11.01.2.

Furthermore, section 13.01.1 creates obligations and potential liabilities for art merchants, not artists, who constitute a separately defined group. The complaint only alleges that Gilbert was in the business of selling the English Prem--there is no allegation in the complaint that Indiana himself ever dealt in fine art. Accordingly, Indiana is not covered by NYACAL § 13.01 in the first place.

Finally, the very language of the COA itself does not violate section 13.01.3(a). The COA states that "I [Gilbert] have zealously reflected his [Indiana's] artistic intention in every work that I [Gilbert] published." (Compl. Ex. 2.) In other words, the COA says that English Prem is by Gilbert--which it is--and not by Indiana, and is therefore entirely in accord with section 13.01.3(a) which requires that "[l]anguage used in a certificate of authenticity . . . stating that . . . work is by a named author . . . means unequivocally, that the work is by such named author." NYACAL § 13.01.3(a).

For all these reasons, Tovar's complaint fails to state a claim for violation of

---

Corrected Objections to Def.'s Mot. to Dismiss ("Pl.'s Corr. Obj."), docket no. 16, at 10-11.) Tovar cites no case for this proposition, and every case the Court can find interpreting section 13.01.3 does so in conjunction with section 13.01.1. See, e.g., Robins v. Zwirner, 713 F. Supp. 2d 367, 374 (S.D.N.Y. 2010); Christie's Inc. v. SWCA, Inc., 867 N.Y.S.2d 650, 656 (N.Y. Sup. Ct. 2008); Levin v. Gallery 63 Antiques Corp., 04 Civ. 1504, 2006 WL 2802008, at *10-12 (S.D.N.Y. Sept. 28, 2006); Pritzker v. Krishna Gallery of Asian Arts Inc., 93 C 4147, 1996 WL 563442, at *3 (N.D. Ill. Sept. 30, 1996) (interpreting NYACAL § 13.01, and noting that an art merchant would be "excluded from protection by the Arts Law"). Plus, divorced from section 13.01.1, section 13.01.3 simply is an aspirational statement and not an obligation for anyone.

NYACAL § 13.01.3(a) against Indiana.

**<u>Breach of the Certificate of Authority</u>**

Tovar next alleges that the COA constituted a contract between him and Indiana, which Indiana breached by renouncing his authorship of English Prem. The elements of breach of contract under Maine law are "(1) breach of a material contract term; (2) causation; and (3) damages." <u>Me. Energy Recovery</u>, 724 A.2d at 1250. A breach of a material contract term of course requires there to be an enforceable contract, the elements of which are "(1) a meeting of the minds; (2) consideration; and (3) mutuality of obligations." <u>Bradley v. Kryvicky</u>, 574 F. Supp. 2d 210; 222 (D. Me. 2008); <u>see</u> <u>In re Estate of McPhee</u>, 904 A.2d 401, 402 (Me. 2006).

The COA fails to meet any of Maine's requirements for an enforceable contract. The COA was not negotiated between Tovar and Indiana--it was a document demanded by Tovar of Gilbert, which Gilbert had endorsed by Indiana--and therefore there could be no meeting of the minds on any of its terms. There is no allegation or basis upon which to draw any inference of consideration for Indiana--Indiana's royalty payments from Tovar's purchases were mandated only by the License Agreement. And the COA creates no obligation for Tovar--Tovar had already purchased the English Prem sculptures from Gilbert. The COA is therefore not a contract, and Tovar cannot allege any "breach" of it.

**Unjust Enrichment**

Tovar next alleges that Indiana has been unjustly enriched due to his collection of royalty payments from sales of English Prem. Unjust enrichment under Maine law requires (1) that plaintiff "conferred a benefit on" defendant; (2) that defendant "had appreciation or knowledge" of the benefit; and (3) that the circumstances show that "ret[ention of] the benefit without payment of its value" would be inequitable. In re Estate of Anderson, 988 A.2d 977, 980 (Me. 2010).

This claim fails for at least two reasons. First, there is no well-pleaded allegation that Indiana ever received any benefit from Tovar's purchases of English Prem. The complaint does not allege that Indiana received any specific dollar amount, or any circumstances or details concerning any royalty payments made by Gilbert or received by Indiana. Indeed, the only allegation of value received by Indiana in the whole complaint is the single line: "Indiana has been compensated with royalties." (Compl. ¶ 70.) However, as is well-established, simply reciting the elements of an offense, without details from which a court can determine whether the allegations made are plausible, is insufficient. See Iqbal, 556 U.S. at 678. And since Tovar purchased English Prem, and the License Agreement under which Indiana would be due royalties covered only Indian Prem, it is in fact implausible that Indiana would have received royalties for Tovar's purchases. Tovar's bald statement that "Indiana has been compensated with royalties," is insufficient to allege the required benefit in an unjust enrichment claim.

Second, even if Indiana had obtained some benefit in this story, Indiana's

15

retention of that benefit would be far from inequitable. Indiana, and possibly Tovar, were essentially <u>defrauded</u> by Gilbert. See Indiana I, 2012 WL 688811, at *1-2. To the extent inequitable profits were made, they were made by <u>Gilbert</u>, not Indiana. Accordingly, Tovar's claim for unjust enrichment fails.

**<u>Misrepresentation</u>**

Tovar's final claim is for the tort of misrepresentation arising from his purchase of the English Prem sculptures in reliance on Indiana's endorsement on the COA. Misrepresentation under Maine law requires (1) a false statement; (2) of material fact; (3) with knowledge of or reckless disregard to its falsity; (4) for the purpose of inducing another to act in reliance upon the statement; (5) the plaintiff's justifiable reliance upon it; and (6) damages. See Allolding, 2003 WL 23109962, at *3; Flaherty v. Muther, 17 A.3d 640, 654 (Me. 2010).[13]

Tovar's claim fails for the very simple reason that there was nothing false in Indiana's endorsement "For Tovar." Tovar purchased the sculptures from Gilbert and, upon having concerns that Gilbert might have lied to him about the sculptures' authenticity, demanded that Gilbert obtain a certificate of authenticity from Indiana. <u>Gilbert</u> then signed the COA, which states that he, Gilbert, is the publisher of English Prem. Indiana apparently placed his signature under his handwritten "For Tovar" because Gilbert would be delivering the COA to Tovar. See Indiana I, 2012 WL 688811, at *3. But the COA itself is a fully executed

---

[13] Similarly, the elements of an action for fraud in New York are (1) a misrepresentation of fact; (2) which is false; (3) which is known by the defendant to be false; (4) made by the defendant for the purpose of inducing the plaintiff to rely upon it; (5) the plaintiff's justifiable reliance upon the representation; and (6) injury. Shovak v. Long Island Commercial Bank, 858 N.Y.S.2d 660, 663 (2d Dep't 2008).

16

...

document with a signature block for Gilbert, and is signed by Gilbert, without Indiana's signature being necessary or appearing on it--Indiana's souvenir-like signature is simply a legally-inoperative add-on. Indiana wrote "For Tovar" knowing that the COA was going to Tovar, a true statement of a true fact. Since the statement was not false, the claim for misrepresentation fails.[14]

## Motion to Amend

Tovar has not moved to amend his complaint. In his supplemental brief in opposition to Indiana's motion to dismiss--Tovar's third brief filed on this motion--however, he off-handedly, and without any authority or support, throws in the single line: "Should the Court disagree [with Tovar's opposition], Tovar respectfully requests the opportunity to replead the complaint." (Pl.'s Supp. Opp'n at 2; see also Pl.'s Corr. Obj. at 11.) Though this request is not being made on any formal motion, the Court will address it regardless.

Rule 15(a) of the Federal Rules of Civil Procedure requires that leave to amend be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). "However, it is well established that leave to amend a complaint need not be granted when amendment would be futile." Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003). Futility turns on whether an amended pleading could withstand a motion to

---

[14] The claim also fails because there is not a single allegation in the complaint suggesting that Indiana endorsed the COA "For Tovar" for any purpose whatsoever related to Tovar, much less for the purpose of inducing Tovar to act in some way in reliance upon the endorsement. Other than the fact that Tovar has here sued Indiana, there is not even a suggestion that Indiana ever had any contact with Tovar, or could possibly have cared how Tovar acted. Plus, since (1) the License Agreement covered only Indian Prem; (2) the COA was for an English Prem sculpture; (3) that Indiana denied authorship of English Prem; (4) and that Indiana flat out did not like English Prem, it is entirely implausible that Indiana would have desired any purchaser, Tovar included, to purchase English Prem in reliance on his endorsement of the COA.

17

dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ricciuti v. New York City Transit Auth., 941 F.3d 119, 123 (2d Cir. 1991).

Based on the above reasoning in granting Indiana's motion to dismiss, the Court finds that an amendment of the complaint on the theories asserted by Tovar would be futile. Tovar simply has no legal action against Indiana. Tovar might have claims against Gilbert, the party who sold him the works at issue in this case. But Indiana has and had no contractual obligations to Tovar, told no lies to Tovar, and had no contact with Tovar creating legal liabilities. Thus, amendment of the complaint would be futile, and Tovar's request that he be given that opportunity is denied.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is GRANTED in its entirety, and this action is dismissed with prejudice.

The Clerk of the Court is directed to terminate the motion at Docket No. 8 and to terminate this case.

SO ORDERED.

Dated: New York, New York
       January 17, 2013

_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE

18